IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROSE TREE MEDIA SCHOOL DISTRICT, | : | |
| Plaintiff | : | CIVIL ACTION |
| v. | : | No. 18-cv-1063 |
| | : | |
| M.J., by and through her | : | |
| Parent and Natural Guardian, M.J., | : | |
| Defendants | : | |

**MCHUGH, J.**                                                                                                            March 6, 2019

**MEMORANDUM**

The Individuals with Disabilities Education Act (IDEA) establishes a right to a free and appropriate public education. A key step in giving force to that guarantee is the process that must be followed when evaluating a child to determine whether they require special education and related services to receive a meaningful education. The question before me is whether the Plaintiff School District conducted an evaluation in compliance with requirements that the child be evaluated in all areas of suspected disability and in a manner that properly considered all of her special education needs. A state hearing officer determined it did not and ordered an independent evaluation at the District's expense. The District now appeals, identifying deficiencies in the hearing officer's analysis. Although some of the school district's criticisms have merit, they are ultimately immaterial to the question presented above.

District courts are charged with the responsibility to enforce the requirements of the IDEA, and the scope of judicial review is broad. After a review of the record, I agree that Plaintiff Rose Tree Media School District failed to conduct an appropriate evaluation of Defendant M.J.'s IDEA eligibility as a student with an Other Health Impairment or Emotional

Disturbance and therefore affirm the Hearing Officer's order of an Independent Educational Evaluation at District expense.

## I. Factual and Procedural Background

M.J. is a student attending high school in the Rose Tree Media School District. The parties disagree about whether the evaluation she received to determine whether she qualifies as a student with a disability under the IDEA was appropriate. M.J. is undoubtedly a gifted student. She received top grades for years and regularly scored in the superior ranges on various cognitive assessments. Her grades began to plummet, though, as she began to be frequently absent from school. In response to these frequent absences, the District proposed "[a] psychoeducational evaluation . . . based on concerns regarding [M.J.'s] emotional functioning and school attendance." Evaluation 1. The Permission to Evaluate form provided to M.J.'s mother stated that the evaluation would consist of the following: a cognitive evaluation; academic achievement testing; "social, emotional, and behavioral rating scales;" teacher input; observations; and a review of records. Permission to Evaluate 2. M.J.'s mother consented to that proposed evaluation.

The evaluation was conducted by a licensed school psychologist who first consulted M.J.'s lengthy medical and personal history. The evaluator took note that M.J. had been diagnosed with Posttraumatic Stress Disorder with Dissociative Symptoms and moderate to severe Major Depressive Disorder and that she had "suffered an exacerbation of both these disorders over the past few months." Evaluation 4. The evaluator also consulted a psychiatrist's report that M.J. has significant sleep problems, getting only 2-6 hours of sleep a night, causing her to fall asleep in class or when trying to complete assignments. He consulted other reports noting that M.J. has a family history of mental illness (father and sister), has suffered multiple

concussions, regularly sees a psychotherapist, and is medicated for her various mental health conditions. The evaluator also took stock of the fact that M.J.'s father "is forbidden to have contact with the children" and that traumatic events M.J. experienced in the past included "divorce, frequent moves, father's use of alcohol and physical and emotional abusiveness [children were witness to violence], death of a great uncle, . . . four severe concussions," and a prior experience of "being beaten up by peers." Evaluation 3, 4.

Second, to assess M.J.'s present cognitive condition and levels of academic achievement, the evaluator partially administered two cognitive and academic assessments: the Weschsler Intelligence Scale for Children-Fifth Edition (WISC-V) and the Woodcock-John Tests of Achievement-Fourth Edition (WJ-IV). M.J. was unable to complete four WJ-IV subtests (calculations, writing samples, math fluency, and sentence writing fluency) due to elevated levels of anxiety and fatigue which affected her concentration.

Third, to assess M.J.'s present social/emotional/behavioral condition, the evaluator proposed to undertake a number of assessments: the Behavior Assessment System for Children-Second Edition (BASC-2), to be completed by M.J., M.J.'s mother, and M.J.'s teachers; the Revised Children's Manifest Anxiety Scale-Second Edition; the Children's Depression Inventory-Second Edition; a classroom observation; and psychoeducational interviews with M.J. Both M.J. and her mother submitted BASC-2 rating scales via the appropriate form, however, M.J.'s teachers refused to provide BASC-2 rating scales of the child, "indicat[ing] that they could not validly complete the scales as they had not observed [her] in several months—and prior to that time she had been absent often." Evaluation 15. M.J.'s mother's responses on the BASC-2 indicated that M.J.'s behaviors were at a clinically significant level of concern on the scales relating to anxiety, depression, somatization, and withdrawal. M.J.'s self-assessment

indicated that she was frequently sick, experienced PTSD flashbacks and nightmares, and had excessive worry regarding her competence and social judgment. She also described instances of feeling like she was outside her own body. The evaluator testified at the hearing that he used information from teacher interviews, meetings, and other teacher input forms used by the school in place of the teachers' BASC-2 rating scales. Due to M.J.'s heightened anxiety and fatigue, and resulting unavailability, the evaluator conducted only 2 out of the 6 proposed psychoeducational interviews of M.J. and did not complete a classroom observation. He also did not administer the Revised Children's Manifest Anxiety Scale or the Children's Depression Inventory.

Based on the information collected, the evaluator checked a box on the evaluation report indicating that M.J. "has a disability but does not need specially designed instruction, and therefore is NOT ELIGIBLE for special education." Evaluation 16. In the discussion that followed, he did not identify the disability he found M.J. to have, nor did he describe the nature of the disability he intended to identify when he checked the box. Rather, the evaluator explained that "the team considered the [IDEA] disability category of Emotional Disturbance, but given [M.J.'s] exceptionally strong performance while in school (e.g., almost exclusively As and Advanced performance on classroom based assessments and standardized test scores), her mental health needs do not adversely affect her overall educational performance at this time." Evaluation 17-18. The evaluator then noted that M.J. met the "DSM-5 criteria for Posttraumatic Stress Disorder with Dissociative Symptoms, Major Depressive Disorder, and Generalized Anxiety Disorder and these symptoms substantially limit a major life function in terms of [M.J.'s] sleep/school attendance." *Id.* at 18. But once again, he stated that "[g]iven that [M.J.] has performed well when in school, even with significant absence throughout the last eight years,

4

the team did not report a need for specially designed instruction/special education services at this time." *Id.*

M.J.'s mother challenged the appropriateness of the evaluation by requesting an Independent Educational Evaluation (IEE). A due process hearing followed, resulting in the Order that is the subject of this appeal.

## II.     Standard of Review

Federal courts apply a "modified *de novo* standard of review" when considering an appeal from a state agency's decision under the IDEA. *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 243 (3d Cir. 2012) (internal quotation marks and citation omitted). District courts cannot "impos[e] their own view of preferable educational methods on the states," and therefore must give "due weight" to the findings in the administrative proceeding (also known as a "due process hearing" in IDEA parlance). *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 557, 564 (3d Cir. 2010). Practically speaking, "due weight" means that "[f]actual findings from the administrative proceedings are to be considered prima facie correct, and if the reviewing court does not adhere to those findings, it is obliged to explain why." *Id.* (internal quotation marks and citation omitted). As for conclusions of law, the review is plenary. "[T]he party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 270 (3d Cir. 2012) (citation omitted). Significantly, the Court of Appeals has specifically held that, in reviewing IDEA appeals, district courts "must decide independently whether the requirements of the IDEA are met." *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 757 (3d Cir. 1995) (internal quotation marks and citation omitted).

## III.  Discussion

The primary purpose of the IDEA is "[t]o ensure that all children with disabilities have available to them a free appropriate public education [FAPE] that emphasizes special education and related services designed to meet their unique needs." 34 C.F.R. § 300.1 (2017).  The first step in making a FAPE available is to provide a child who is suspected of having a disability with an appropriate evaluation to determine whether she is eligible to receive a FAPE. *See* 34 C.F.R. § 300.8(a)(1)-(2).  Eligibility is a two-step analysis that determines: (1) whether the child meets one or more of thirteen disability categories[1] and (2) whether the child requires special education services as a result of that disability.  34 C.F.R. § 300.8(a)(1).

For an evaluation to be appropriate, it must follow the procedures proscribed by Sections 300.304 through 300.311 of IDEA regulations when collecting the information necessary to determine whether the child has a disability and the educational needs of the child.  34 C.F.R. § 300.8(a)(1).  Under Section 300.304, the school district (1) must use a variety of assessment tools, (2) cannot use any single measure or assessment as a sole criterion for its determinations, and (3) must use technically sound instruments to assess cognitive, behavioral, physical, and developmental factors.  34 C.F.R. § 300.304(b)(1)-(3).  The evaluation does not have to be designed to identify and diagnose every possible disability, but must ensure the child is "assessed in all areas of suspected disability." *D.K.*, 696 F.3d at 250 (3d Cir. 2012) (quoting 20 U.S.C. § 1414(b)(3)(B)); 34 C.F.R. § 300.304(c)(4).  Additionally, the evaluation must be "sufficiently comprehensive to identify all the child's special education and related services needs, whether or

---

[1] IDEA regulations list thirteen disability categories. *See e.g.* 34 C.F.R. §300.8(c).  The categories at issue here are Other Health Impairment, Emotional Disturbance, and Specific Learning Disability.  34 C.F.R. § 300.8(c)(4), (9), (10).

6

not commonly linked to the disability category in which the child has been classified." 34 C.F.R. § 300.304(c)(6).

When interpreting the information collected to determine eligibility and educational need, the school district must "(i) [d]raw upon information from a variety of sources, including aptitude and achievement tests, parent input, and teacher recommendations, as well as information about the child's physical condition, social or cultural background, and adaptive behavior; and (ii) [e]nsure that information obtained from all of these sources is documented and carefully considered." 34 C.F.R. § 300.306(c)(1)(i)-(ii).

A parent can challenge the appropriateness of an evaluation by requesting an Independent Educational Evaluation (IEE) at the public's expense. 34 C.F.R. § 300.502(b). Upon receiving this request, the school district must either agree to fund the IEE or file for a due process hearing, where it must show that its evaluation was appropriate. *Id.* If it fails to do so, the IEE will be granted.

Here, M.J.'s mother requested an IEE and a due process hearing was held for the District to show its evaluation was appropriate. The Hearing Officer concluded that the District failed to meet its burden, finding the evaluation (1) failed to assess M.J. in all areas of two suspected disability categories—Other Health Impairment and Specific Learning Disability—and (2) failed adequately to evaluate her under the disability category of Emotional Disturbance. The Hearing Officer further concluded that as a result, M.J. was entitled to an IEE. While I disagree with the Hearing Officer's conclusion that the assessment of Specific Learning Disability was incomplete, I concur that the evaluation failed to assess whether M.J. qualified under Other Health Impairment and that its assessment of Emotional Disturbance was inadequate. For these reasons,

I affirm the Hearing Officer's ultimate determination that M.J.'s mother had a right to an Independent Educational Evaluation at public expense.

### A. *The District Failed to Assess M.J. in All Areas of Suspected Disability*

The Hearing Officer concluded that the District did not evaluate or consider M.J.'s eligibility for IDEA services as a child with an Other Health Impairment (OHI). This conclusion is supported by the fact that the Evaluation Report expressly assessed M.J.'s eligibility under the IDEA's categories of Emotional Disturbance and Specific Learning Disability but nowhere set forth any assessment or discussion related to OHI. At the hearing, the Hearing Officer noted "I don't see [OHI] in the report." Hearing R. 126:15. A review of the Evaluation Report confirms that this category is not explicitly mentioned.

As a threshold issue, there seems to be no dispute that OHI was an area of suspected disability for M.J. But, the District now somewhat brazenly argues that the evaluation both assessed M.J. under OHI, and identified OHI as her disability, even though the term "Other Health Impairment" appears nowhere in the report. This argument relies on an inventive interpretation of the record that goes as follows: (1) the evaluator determined that M.J. had *some* disability because he checked off the "disability" box on the Evaluation Report; (2) the evaluator concluded that M.J. did not meet the eligibility for the Emotional Disturbance or Specific Learning Disability categories; (3) in finding she had a disability, the evaluation referenced OHI criteria; (4) necessarily, therefore, the IDEA disability the evaluator *must have* meant to identify was OHI. In support of its assertion that the evaluation referenced OHI criteria, the District cites the following excerpt from the evaluation: "she meets the DSM-5 criteria for Posttraumatic Stress Disorder with Dissociative Symptoms, Major Depressive Disorder, and Generalized

8

Anxiety Disorder, and these symptoms substantially limit a major life function in terms of [M.J.'s] sleep/school attendance." District Mot. J. Admin. R. 19, ECF No. 16; Evaluation 18.

This excerpt from the evaluation bears little resemblance to OHI criteria found in IDEA regulations but seems instead to reference the eligibility criteria in Section 504 of the Rehabilitation Act, which requires certain accommodations for children with disabilities. 34 C.F.R. § 104.3. The IDEA defines an "Other Health Impairment" as having limited vitality or alertness that "results in limited alertness with respect to the educational environment, that [i]s due to chronic or acute health problems . . . and [a]dversely affects a child's performance." 34 C.F.R. § 300.8 (c)(9). Section 504 eligibility, in contrast, is defined as "any person who [] has a physical or mental impairment which substantially limits one or more major life activities." 34 C.F.R. § 104.3(j)(1)(i). The excerpt of the evaluation the District cites clearly refers to Section 504, and the District does not explain why or how it could have any bearing on whether OHI was assessed. Therefore, the District's argument that OHI criteria was in fact considered in the evaluation has no support in the record.

I am not prepared to infer the basis for the evaluator's conclusion where the Evaluator himself has not supplied it. The record shows that the evaluator (literally) checked the box for IDEA disability without identifying which IDEA disability he found or discussing its nature in any specific way. This stands in stark contrast with the inquiries undertaken to determine whether M.J. had a disability under the Specific Learning Disability or Emotional Disturbance categories, where relevant assessments were performed, data was collected, and results were considered.

A summary conclusion without explanation does not suffice, and I decline the District's invitation to speculate as to the evaluator's thought process. I therefore affirm the Hearing

9

Officer's determination that the District did not meet its burden to show that it assessed M.J. in all areas related to OHI. Because OHI was a conceded suspected disability, M.J. was not assessed in "all areas related to the suspected disability" and the evaluation was therefore inappropriate under the requirements of the IDEA. 34 C.F.R. § 300.304(c)(4).

### B. *The District's Evaluation of "Emotional Disturbance" Was Inadequate*

Although the District did assess M.J. in areas related to Emotional Disturbance, the Hearing Officer found flaws in (1) how it conducted its assessment to determine if M.J. met the Emotional Disturbance classification and (2) how it determined whether she required special education services as a result of that disability.

An "Emotional Disturbance" under the IDEA is "a condition exhibiting [certain] characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance." 34 C.F.R. § 300.8(c)(4)(i). These characteristics can include a "general pervasive mood of unhappiness or depression" and a "tendency to develop physical symptoms or fears associated with personal or school problems." 34 C.F.R. § 300.8(c)(4)(i)(D), (E).

The Hearing Officer took issue with the fact that the District's evaluation of Emotional Disturbance relied heavily on the Parent's BASC-2 scores, which indicated she was eligible, along with two clinical interviews of M.J. that also confirmed emotion deficits, but then curiously found no disability. Finding no cogent explanation why the evaluation discounted this data without performing additional assessments, the Hearing Officer concluded the evaluation was insufficient to determine how M.J.'s "behavior, social, or emotional[] deficits are adversely affecting the Student's current . . . education and ongoing need for specially-designed instruction." Order 13.

The District makes three arguments that its evaluation adequately assessed M.J. under Emotional Disturbance, but none carry their burden of persuasion. First, the District argues the Hearing Officer's conclusion is invalid because it is based on erroneous factual findings that M.J. did not complete a BASC-2 rating scale. While the District is correct that the record reflects M.J. did indeed complete a BASC-2 rating scale, by its own admission this factual error is immaterial. The District concedes in its briefing that M.J.'s responses were "consistent" and that it "is not questioning whether M.J.'s responses, like her Parent's, indicate a disability; they do." District Reply 4, ECF No. 19. Therefore, even if the Hearing Officer had correctly found that M.J. had completed the rating scale and considered her responses, it would have only strengthened his conclusion that the District discounted an assessment indicating a disability without a sufficient reason.

Second, the District argues that the Hearing Officer erred in disregarding material testimony from the evaluator about other information collected for the BASC-2. At the hearing, the evaluator testified that even though the teachers did not complete BASC-2 rating scales, he "had at least sufficient information" from teacher interviews, meetings, and other teacher input forms used by the school. Hearing R. 69:23-24. The Hearing Officer heard this testimony in person and had the opportunity to make a credibility determination. The Hearing Officer did not cite this testimony in his findings of fact, or elsewhere, as a source of additional information for the BASC-2 assessment, and I cannot simply assume he credited the evaluator's testimony. The District points to no compelling evidence which would justify overruling the Hearing Officer's somewhat self-evident finding that the BASC-2 indicated M.J. had a disability. Even if credible, the Evaluator's testimony would at most show that the District had teacher input that conflicted in certain ways with other substantial evidence, including rating scales from M.J. and her mother,

11

along with clinical interviews and diagnoses which all indicated a disability. What further undercuts the District's argument is its admission that the evaluation "took into consideration the Parent and Student responses on the BASC, along with the other medical and psychological information, to conclude that MJ had a disability." District Resp. 4, ECF No. 18. As a result, I cannot conclude that the Hearing Officer erred in his ultimate determination that the BASC-2 indicated a disability that the District appeared to disregard.

Third, the District argues that the Hearing Officer committed an error of law in relying solely on the Parent's BASC-2 rating scales, because the IDEA prohibits the use of any single measure or assessment as the sole criterion for determining a child's eligibility and educational needs. This argument makes little sense, however, because Section 300.304 applies to the school district conducting an evaluation, not a Hearing Officer; the only entity who could have violated the particular provision cited by the District was itself. Moreover, the Hearing Officer made no determination about M.J.'s eligibility or education needs but rather found that the evaluation itself was inappropriate.

The District's arguments are not sufficient to explain why it found M.J. fell outside the classification of Emotional Disturbance, despite so many indicators showing that she fit within that category. Therefore, I concur with the Hearing Officer's conclusion that the measures employed to determine whether M.J. met the criteria for Emotional Disturbance were insufficient under the IDEA's procedural requirements.

Assuming the District had found M.J. met the criteria for "Emotional Disturbance" and that its evaluation was sufficiently comprehensive to provide enough information to do so, it then had to determine whether M.J. required special education as a result. 34 C.F.R. § 300.8(a)(1); 34 C.F.R. § 300.304(c)(6). At this point, it is important to note, as did the Hearing Officer, that a

child classified as mentally gifted may nonetheless meet IDEA eligibility criteria.[2] It is perhaps with this in mind that the Third Circuit approvingly cited *G.D. ex rel. G.D. v. Wissahickon Sch. Dist.*, 832 F. Supp. 2d 455 (E.D. Pa. 2011) for the proposition that a school's evaluation of a child can be inadequate if it overemphasizes a student's cognitive abilities and past academic achievements without addressing the student's present issues that are impeding learning. *See D.K.*, 696 F.3d at 250. In *G.D.*, Judge Baylson specifically held that a school district has an "obligation to look beyond . . . cognitive potential or academic progress and to address the attentional issues and behaviors . . . identified as impeding [a child's] progress." *G.D.*, 832 F. Supp. 2d at 466-67. Therefore, particularly when evaluating a child with above average cognition and academic performance, a school district must take care to ensure it is not distracted from focusing upon the child's disability-related educational needs.

The question then is whether the District carefully considered M.J.'s disability-related issues that were impeding her learning. Persuasive authority from the Eight Circuit emphasizes the importance of identifying whether an underlying emotional impairment is causing or substantially contributing to a child's attendance issues. *See Indep. Sch. Dist. No. 284 v. A.C.*, 258 F.3d 769 (8th Cir. 2001). There, in a case involving a child who experienced significant emotional turmoil, the Court noted that the student's early traumatic experiences "tend to show that [the child's] truancy . . . result[s] from a genuine emotional disturbance." *Id.* at 776. The Court determined that "[i]f the problem prevents a disabled child from receiving educational benefit . . . [w]hat should control our decision is not whether the problem itself is 'educational'

---

[2] The District argues the Hearing Officer erred in citing a 1992 letter from the Federal Office of Special Education Programs that has since been supplanted by the 2006 amendments to the IDEA. Technically that may be true, but the letter was cited for the accurate and uncontroversial proposition that a gifted child may also have a qualifying disability. Therefore, the error was one of form, not substance.

or 'non-educational,' but whether it needs to be addressed in order for the child to learn." *Id.* at 777.

The District here seemingly made no effort to explore a causal relationship between M.J.'s emotional functioning and her attendance, which the District itself points out was adversely impacting her educational performance: "[M.J.] was absent a significant number of days during the second marking period and her grades reflect the 0s that she received for work that was not complete after the agreed upon extensions were provided." District Mot. J. Admin. R. 30. Instead, the District concluded that M.J. did not meet category of Emotional Disturbance because given her "exceptionally strong performance while in school (e.g., almost exclusively As and Advanced performance on classroom based assessments and standardized test scores), her mental health needs do not adversely affect her overall educational performance." Evaluation 18. In the next paragraph of the evaluation, the District goes on to state: "[g]iven that M.J. has performed well when in school, even with significant absence throughout the last eight years, the team did not report a need for specially designed instruction/special education services at this time." *Id.* By resting nearly all of its analysis on M.J.'s past academic performance and failing to determine whether a causal relationship existed between her disability and present attendance issues, the District inappropriately overemphasized M.J.'s academic performance in finding her non-eligible under the IDEA.

Because the District failed to adequately assess whether M.J. met the criteria for Emotional Disturbance and failed to properly determine whether she needed special education services as a result, I agree with the Hearing Officer that its evaluation of M.J. in areas of Emotional Disturbance failed to comply with IDEA procedural requirements.

*C. The Evaluation Adequately Assessed M.J. for a Specific Learning Disability*

The District also takes issue with the Hearing Officer's determination that the District did not adequately evaluate M.J. for a Specific Learning Disability (SLD). The District asserts that SLD was never a suspected disability and that there is no indication in the record suggesting it. The Evaluation Report itself belies this contention. The instructions at the top of Page 20 of the Evaluation Report state as follows: "Determination of Specific Learning Disability. NOTE: This component must be completed when determining eligibility for Specific Learning Disability." Evaluation 20. The Evaluator did in fact complete the sections that followed, and specifically included a final analysis that given M.J.'s average range scores, she met grade-level standards in all areas and so did not qualify for SLD specialized instruction. Evaluation 20-21. Clearly then, SLD was an area of suspected disability. Whether the District properly assessed M.J. under SLD, though, is a closer question.

A child has an SLD under the IDEA if she "does not achieve adequately for the child's age or to meet State-approved grade-level standards" in areas including oral expression, listening comprehension, written expression, basic reading skill, reading fluency skills, reading comprehension, mathematics calculation, and mathematics problem solving. 34 C.F.R. § 300.309(a)(1). Even taking into account M.J.'s recent "zero" scores due to her inability to attend school, her grade averages still met grade-level standards. Accordingly, the District's argument that it properly ruled out SLD has substantial weight.

But any error in this regard does not change the fact that the evaluation did not properly rule out Other Health Impairment or Emotional Disturbance.

## IV. Conclusion

The District's evaluation, in failing to assess M.J. all areas of suspected disability and to adequately assess whether she was eligible under "Emotional Disturbance," violated IDEA requirements for an appropriate evaluation. I therefore affirm the Hearing Officer's order of a comprehensive Independent Educational Evaluation at public expense. *See* 34 C.F.R. § 300.502. For the foregoing reasons, I grant Defendants' Motion on the Administrative Record to the extent that it affirms the Hearing Officer's determination that the District's evaluation was inappropriate and order an Independent Educational Evaluation at public expense. Defendants, as prevailing parties in the administrative proceedings, are also entitled to attorney's fees and costs.[3] An appropriate Order follows.

/s/ Gerald Austin McHugh
United States District Judge

---

[3] "Attorneys' fees. (a) In general. (1) In any action or proceeding brought under section 615 of the Act, the court, in its discretion, may award reasonable attorneys' fees as part of the costs to—(i) The prevailing party who is the parent of a child with a disability." 34 C.F.R. § 300.517.